We'll hear argument first this morning in Case 11-681, Harris v. Quinn. Mr. Messenger. Mr. Chief Justice, and may it please the Court. Illinois is forcing Susan Watts and thousands of other home care providers to pay compulsory fees to the SEIU to petition the State about its Medicaid program that pays for their services to persons with disabilities, in Mrs. Watts' case, her daughter Libby. This violates the First Amendment because the purpose of this mandatory association is inherently expressive, to petition the government for a redress of grievances, otherwise lobbying. And also because this program was to negotiate what's typically negotiated in collective bargaining, that is wages, isn't it, is that not so? Wages and benefits? The subjects of bargaining here are the reimbursement rates given to the providers, and the State now offers or pays money to the SEIU for a health benefit. But that is petitioning the government with regard to those negotiations. But how does it differ from the typical bargaining that a union does? It asks for a wage rate and it asks for various benefits. So are you saying that when it's a public sector, in the public sector, it gets converted into something else? Yes. In the public sector, when a group is petitioning the government for money, that is petitioning the government over a public program, here from a Medicaid program. It would be very little different than if the American Medical Association was asking for higher Medicaid rates for doctors or for nurses. Is your argument dependent on this being sort of a dual-employee situation, that it's reimbursement as opposed to policemen, fire — police people, fire people, teachers, other public — other public employees who are directly employed by the State? That is our position for why Abood is distinguishable on that point, is that here the State is not the common law employer or the sole employer of these providers. It simply pays them for their services, much like a health insurer pays for the services of medical professionals. But your argument, of course, isn't limited to that. It goes beyond that situation. Yes. And that the actual bargaining, even on behalf of true employees, is also petitioning and political in nature, and for that reason, Abood should be overruled. Is there any likelihood that the union that represents these, what did I call them, health care workers, health providers, care providers, is there any likelihood that they would try to bargain for benefits for these workers? Would the union attempt to? Yes. Yes. Is there any likelihood? Do we know anything about what the likelihood would be for certain subjects to be brought up in the bargaining with the State? Well, one thing that has happened, this is in the collective bargaining agreement, is the State has agreed to give certain amounts of money to an SEIU health care fund to offer access to health benefits for those providers. So the State is funding the SEIU's health benefit program to that extent. Did they have that before the union? No. Suppose you have a policeman who is dissatisfied with his wages, so he makes an appointment with the commissioner, police commissioner, and he goes in and grouses about his wages. He does this, you know, 10 or 11 times, and the commissioner finally is fed up and he tells his secretary, I don't want to see this man again. Has he violated the Constitution? No. Has he prevented a petition for a redress of grievances? No, because in that, with an individual speaking, it's a matter of private or an internal proprietary matter that under this Court's precedents don't rise to a matter of public concern. However, if you had an organization petitioning a police district for wages across the board for police officers, then that is a matter of public concern and would violate the Constitution. I really don't understand that. Scalia, when you so, what if it's 10 policemen who do this, it's still not a matter of public concern, but does it have to be the whole police force? The line would be, once you have the collective, it would start to become a matter of public concern. It would be the public concern. It seems to me it's always a matter of public concern whether you're going to raise the salaries of policemen, whether it's an individual policeman asking for that or a combination of policemen or a union. It's always a matter of public concern, isn't it? And if it is, then I submit that it's unconstitutional for it. Okay. To not give this guy an appointment the twelfth time. No. This police chief can certainly shut his door, but what it would be unconstitutional is to force that. Well, how can he shut his door if he has a right to petition, constitutional right to petition for the redress of grievances? His grievance is he's not being paid enough. But in that case, under our public concern test, which goes within the Pickering line, that that individual grievance would not rise to a First Amendment petition. But the same grievance, if the union had presented it, the grievance is the salaries for policemen are not high enough. But the scale is not high enough. He's not asking for just his salary to be raised. He wants salaries of all the cops to be raised. Well, two points. The first is the scale is what differentiates it. So here you have a union petitioning a State for Medicaid rates that are paid for 20,000-some care providers. And so the scale of it is what makes it a matter of public concern or a matter of law being used to go. Kagan – But what you're objecting to, to the extent that you're not objecting to the entire system of collective bargaining, you're objecting, you're saying an individual employee can say, I don't feel like supporting a union that makes a certain kind of argument about wages or about benefits. So just to carry on with Justice Scalia's example, the subject matter is the exact same in the two contexts, whether it's an individual employee or whether it's a union. And in both contexts, the ultimate sanction is the same, right? Somebody grouses about his pay too much, he could get fired. Somebody refuses to support a union that is negotiating about pay, he can lose his job. So it's really identical across the two situations. Same subject matter, same sanction. What's the difference? There's two differences. One, again, is the scale. When you talk about a union collectively petitioning a school district or an institution But you're not objecting, I think, to the union as a whole. What you're objecting to is an individual employee having to support that activity. The scale is no different. It's an individual employee. Yes. It's an individual employee being forced to support that expressive activity. So the question becomes, what expressive activity are they being forced to support? And when you're speaking of changing an entire government program, for example, Medicaid rates across the board, that is a matter of public concern. That is a matter of lobbying or political. But that's exactly what the individual employee in Justice Scalia's hypothetical is arguing for. He wants wage rates to be changed across the board. He knows they're not going to be changed just for him. He wants higher wage rates. But, again, under this Court's private public concern test, an individual, simply speaking of that, usually does not rise to a matter of public concern. Well, Mr. Messenger, I'm confused by this whole line of argumentation. I didn't think there was any issue in this case about the right of the plaintiffs or any of the other affected workers to say whatever they want on their own. They're not prohibited from doing that, are they? So there isn't any issue about that in the case. I thought the issue, and they could try to meet with anybody they want as many times as they want. I suppose that person has the perfect right to say, enough is enough, I don't want to meet with you for the fifth time or for the first time. I thought the issue was whether they could be required to pay for somebody else to go and speak and possibly say things that they disagree with. Yes, exactly, that they're being forced to support an organization here, the SEIU, to speak or petition the State over its Medicaid rates. So the distinction is, just as you say, Sotomayor So let's break this down. You're not arguing that there's something wrong with a union, qua union. Is there anything wrong with the State saying, we're not going to negotiate with any employee who's not a member of the union? Yes. I'm sorry, there is, Your Honor, there is not a problem with that, because  Sotomayor Is there a problem for the State to say the union to organize has a certain amount of cost? So putting aside fair representation laws, could the State say, this is what we're going to pay police officers, $100, but we're going to pay union members $110 to reimburse them for the cost of negotiation? Would that be okay? Yes. Under Knight, the State can choose who it bargains with, and if it chooses to set different rates for union and non-union, it could, as you said, notwithstanding fair or duty of fair representation. Sotomayor So there's no problem here with the representation. Your problem is with the fair share. Yes. Forcing the individuals to support the union for the purpose of petitioning the State over here the Medicaid rates for home care. Are there any, you suggest in response to my colleague's question, that they could, the State could pay health care providers different rates. Is there, are there any limitations? We're talking about Medicaid reimbursement. Are there any limitations that would prevent differential rates of pay, reimbursement under Medicaid for the same services? There may be statutes where I know that most Medicaid programs are, across the board, set rates. But also constitutionally, if there was a differential after a degree, it could be considered a penalty for the individual exercising their rights. But as far as I know, most Medicaid programs, and particularly the one here, it's always been a fixed rate established across the board. Scalia Mr. Messenger, just to clarify what was the purpose of my earlier line of questioning, it was simply to show that if you have a case, it doesn't rest on the right to petition the government for redress of grievances. It rests on the First Amendment. You say that there is being, your people are being required to support speech that they don't agree with. Messenger Yes, Your Honor. Scalia Now, that is, you know, that is an arguable position. But I don't think it's even arguable that the right to petition the government for redress of grievances is involved here. Messenger It's the expression they're being forced to support, Your Honor. So the violation, as you say, is they're being forced to support expressive activity. And that expressive activity is not a violation, not a denial of the right to petition the government. Messenger Yes, Your Honor. They're not being denied the right to petition in the sense that the State is saying they cannot petition. Instead, they're being forced to support petitioning. Kagan Mr. Messenger, I'm not sure that Justice Scalia's answer satisfies his own question. Messenger What was the question? Kagan Because here's the thing. That in the workplace, we've given the government a very wide degree of latitude. And there's much that the government can do. It can fire people. It can demote people for things that they say in the workplace. Not for things that they say as a citizen, but for things that they say in the workplace. That's the fundamental lesson of Garcetti and of many, many others of our cases. So you're saying, well, the government can punish somebody for saying something, but the government in the exact same position cannot compel somebody to say something they disagree with. And I want to know what's the basis for that distinction, which it seems to me is just as hard as if you were answering under the Petition Clause. Scalia I want to hear the answer, too, because contrary to what Justice Kagan suggests, I didn't say your First Amendment argument was valid. I said at least it was a comprehensible argument. Kagan Jump in whenever you'd like. The way in which home care providers petition the State, I submit, is not an internal proprietary matter that the government has free reign to manage. And so the distinction between government acting as proprietor, as you say, the government can tell an employee on work time that you can't engage in certain speech if it interferes with the workplace. But the way in which an individual associates with to lobby for a certain kind of work or lobby or petition the State is not an internal proprietary matter. So, for example, here, the way in which Susan Watts and other home care providers petition the State is not internal workplace speech. Scalia Why isn't it? I mean, it is for private employers. There are some private employers who think they're better off with a closed shop, and they just want to deal with one union, and they require all the people that they have to do it for representational purposes. They do this as private employers, because they think it is in their interest as an employer. Why can't the government have the same interest? Because when the government is involved, the First Amendment interests are much heightened, because you're dealing with attempting to influence government policy. But don't tell me that there's no employer interest. There is an employer interest. You're just saying it is not considerable enough, right? Yes, it's not considerable enough. Here, the State lacks. Sotomayor But what stops the non – the people who oppose the union policy from sending a letter, asking a meeting, expressing their disapproval in any forum they want and in any way they want to whatever policy the union is advocating? Is there anything that stops them from doing that? No, there isn't, Your Honor. However, I submit that it's not So where is the First Amendment abridgment? They can do whatever they want. They can speak however they want in support of or in opposition to absolutely anything the union is doing. Your Honor, it's the compelled speech. And the fact that the individuals have other First Amendment rights is not exculpatory. So it's the compulsion to support the SEIU's positions in petitioning the State. That is the First Amendment violation. And the fact that I suppose the fact that you're entitled to speak against abortion would not justify the government in requiring you to give money to Planned Parenthood. Exactly, Your Honor. That's the argument you're making. Yes. And actually, I submit that the fact that providers do remain free to petition the State only shows that the so-called labor peace interest hasn't been done here by Illinois, because the interest there is to avoid competing demands from various providers. Here, the fact that each provider does in fact remain free to petition the State through organizations other than the SEIU shows that the State has not achieved any sort of labor peace as the State could potentially achieve within its workplace. Mr. Messenger, do you agree? Well, but I mean, I suppose there could be labor peace if the Respondents were to prevail. I mean, that assumes that your theory of the case is going to prevail. Well, no. Even if the scheme here doesn't. Isn't there labor peace? Let's assume that's a valid interest. Isn't there labor peace if one union represents these health care providers and makes and negotiates a contract with the government? No. And so I submit that the labor peace interest isn't valid here, because in dealing with the Medicaid program, the State doesn't have an interest in avoiding competing demands from rival groups regarding its policies on it. That is, democratic control. Well, why doesn't it? It gets the demand from the union, it recognizes it's reasonable, that's the policy, and then it can move forward with the policy. Well, the State could unilaterally do that without bargaining with the union. Mr. Messenger, do you think the issue of exclusive representation is inextricably tied to the issue of the assessment of an agency fee? Can't you have the former without the latter? Yes, you can, in at least two ways. The first of which is that Knox, of course, lays out a two-part test. The second part test, even if the first is satisfied, that the mandatory association here, exclusive representation, is justified by compelling interest, you still go to the second test of whether or not fees are a necessary incident to that representation. And I submit that Illinois does not satisfy that test. But you're not challenging, or it's confusing whether you are or not, the very idea of exclusive representation by a union. Are you saying that in the public sector it cannot be exclusive, an exclusive bargaining agent? It's not directly challenged in this case, but it becomes relevant under the first Knox test, which asks whether the mandatory association being supported by the compulsory fees is justified by compelling State interest. Well, it's a mandatory. Let's take out, as Justice Alito suggested, take out the agency fee or fair share fee, whatever it is, that there is an exclusive bargaining agent. Workers, your clients say, we don't want to be represented by that union. The union is authorized to represent everybody in the workplace and has to represent even nonmembers as well without any discrimination. Are you taking the position that there cannot be an exclusive bargaining agent if there are any dissenters who don't want to be represented by a union? Not in this case, Your Honor. This case does not present the question of whether exclusive representation alone would constitute a First Amendment injury, because the complaint here is focused towards the compulsory fees. So that particular issue is not used. So you don't So, Mr. Mettinger, even on the compulsory fees, what strikes me is that this is, I'm just going to use the word here, it is a radical argument. It would radically restructure the way workplaces across this country are run. And let me just put it to you this way and ask if you agree with this statement. Since 1948, since the Taft-Hartley Act, there has been a debate in every state across this country about whether to be a right-to-work state. And people have disagreed. Some states say yes, some states say no. It raises considerable heat and passion and tension, as we recently saw in Wisconsin. And but, you know, these are public policy choices that states make. And is it fair to say that what you are suggesting here, your argument, is essentially to say that for 65 years people have been debating the wrong question when they've been debating that, because in fact a right-to-work law is constitutionally compelled? In the public sector, yes. That it is in fact the first public sector labor law was actually in 1959 in Wisconsin. So it's relatively recent when you're involving with government. But yes, our position is, is that in the public sector, when government is involved, compulsory fees are illegal under the First Amendment. Kennedy, Suppose the Court were to say that on the issue of salaries, there is no First Amendment violation, that a boot should remain applicable to public employee union. Are there other issues that public employee unions necessarily raise in collective bargaining that raise other concerns about governmental policies that union members might disagree with? Yes, Your Honor. Speaking of true employees, we're not speaking of Medicaid providers, but speaking of true employees, this was discussed in Abood with respect to public schoolteachers and all the different aspects that the union petitions over that has to do with class sizes, hours worked. Benefits are a huge issue, of course, in terms of financially, for many school districts, health benefits. So there are many issues of the way the school district actually operates. How about here for your employees? They negotiate health insurance? Do they don't negotiate termination, because that's up to the individual party. Yes. So there's no grievance committee. Do they negotiate the tasks that will be reimbursed? No. The tasks that the State will reimburse are set in a service plan. That's not a mandatory subject charge. So you're being asked to have a fair share of how much you're getting from the State for your services and health insurance. What else is negotiated that you're being asked to pay for? As far as what they're being forced to support is the reimbursement rate. The State is giving money to an SKU health care fund, which many providers may or may not use. The State is giving money to an SEIU member training fund to provide voluntary training to providers and also to conduct an orientation that new providers will be forced to support. Scalia, those things, you can argue, are not part of the representation for which they should be charged. And they should get their money back for those things, if they're actually not getting any benefit from them. Well, I would submit that they shouldn't be forced to pay for any of this petitioning regarding how the State chooses to run this Medicaid program. No, but there are, I mean, what our cases say is you can be compelled not to be a free rider, to pay for those items of bargaining that benefit you as well as everybody else. But you don't have to pay for stuff that is not within that description, stuff that doesn't benefit you at all. That's true for true employees under this Court's previous cases. But the question, of course, here is, do those same principles apply to Medicaid providers or anyone else who receives money from government? And that's what we see. They receive a salary. I mean, they receive, it's not a government grant to the healthcare worker. They receive a paycheck and the government withholds from that. The government makes a FICA contribution for them and withholds the part that's their responsibility. So it looks just like they are an employee of the government being paid by the government and the government doing things that an employer does, withhold income tax, pay in part the FICA tax, withhold the other part. And they are also covered by workers' compensation, aren't they? Yes. Under Illinois law, they have. As employees of the State? Yes, Your Honor. But the wage, the fact, defining whether it's wages or a flat reimbursement rate or a grant, I don't, I submit is not constitutionally relevant. So, for example, the Act was recently extended to independent nurses and therapists who provide in-home care. They are paid a flat rate as opposed to an hourly, what do you call it, wage. Constitutionally, there is no difference. The bottom line is it's money from government, from a HERA Medicaid program, to provide care to other individuals. And I submit that doesn't create an employment relationship, any more than a doctor is privately employed by a health insurance company merely because they pay for it. They are not getting a paycheck and the insurance insurer is not deducting withholding tax, isn't paying FICA tax? Well, on that, that is paid, but the State is doing it as pay agent. And so while this money is coming from the State, the State is doing it as pay agent for the person with disabilities who is truly the employer. Alito, I thought the State took the position that these individuals are State employees for one purpose only, collective bargaining. Isn't that their position? Yes, that's right in the statute, Your Honor, that it's solely for purposes of collective bargaining. So if one of these individuals commits gross misconduct, causes the death of a patient, the State has no liability? It's right in the statute. The State said it's not, does not extend vicarious liability to independent providers. When you come back, I'd appreciate your thinking about this, but obviously you're asking us to overturn a case that's been the law for 35 years. I count hundreds of citations in the opinion and I guess there are millions of instances in which employees and employers and others have relied on it in collective bargaining. So I'd appreciate your saying a sentence or two of why we should have upset reasonable expectations over so long a period of time. I'd like to reserve the remainder of my time, Mr. Chief Justice. Thank you, counsel. Mr. Smith. Thank you, Your Honor. Mr. Chief Justice, and may it please the Court, 10 years ago the State of Illinois made a decision about the best way to deliver home care services to thousands of persons with physical disabilities in the State who, without those services, would need to live in institutional settings.  The collective bargaining agreement for these workers that it was paying would help meet its service delivery goals for this population, this group of workers, which was once. Sotomayor, if your adversary says that the reimbursement rate is set by the Medicaid program, so why do you need a union to tell you how much to pay if it's already set? There is no reimbursement rate for these workers set by the Medicaid program, Your Honor. The amount of money they're paid is an hourly wage set in the collective bargaining agreement. When the union was first recognized, it was $7 an hour and there were no benefits. Because the State has chosen to work with its union, it has produced a package of benefits designed to create a solution to the morale problems, the recruitment problems. I don't understand what you're saying. If there were no union, there would be no wages? Your Honor, the State's judgment is that it can better make these determinations in partnership with the union, and the process of negotiation gives it both tangible and intangible benefits. The tangible benefits is it figures out what the priority needs of the worker are. So from the outset, it set up the union, right, and the union said we want $7 an hour? Was that it? The $7 an hour was what they were getting paid before the union was on the scene, Your Honor. And the State did. And who picked that number? The State did. The State did. And it gave the workers the opportunity, as it has every right to do, to have a majority of the people in the workforce say, we'd like to be represented, we'd like to have somebody in the room representing us. And as a result, they not only have substantially increased the wages, but they have paid health care, they have paid training and orientation. There's a grievance system, which is extremely important. Why do you think Medicaid had something to do with how much they were reimbursed? You're saying Medicaid is beside the point? Your Honor, in this kind of thing, we're talking about the wages of basic care workers, like if they were in a nursing home or in a State hospital or wherever they might be. If you hire a home care provider to provide home care services, isn't how much the person is compensated? You have a Medicaid program, a cooperative program of the Federal Government. Doesn't it set the rates with which those services are reimbursed? The wages for these kinds of workers are set by the State under the Medicaid program. They're not set by the Federal Government, Your Honor. Well, right. That means it's a cooperative State-Federal program. But isn't there – are you saying the wages have nothing to do with how much the Medicaid reimbursement for these types of services? Well, Your Honor, the reimbursement – these are people being employed by the State with money that happens to come from the Medicaid program in order – it's a Federal project to get people out of nursing homes into their homes. And so they let the State divert money over to pay for these people to be in the home. I mean, they don't give you a bunch of money and say, well, here it is. You figure out how much you want to – I mean, I thought this case had something to do with the fact that Medicaid was used to reimburse these employees, and you're saying it has nothing to do with that at all. Your Honor, as I understand the constitutional challenge in this case, the source of the money, the State's decision about the – I just want to know what – not that there are challenges. I want to know where the money comes from. It comes from Medicaid, and I assume Medicaid sets some parameters about how much you can reimburse home care providers.  My understanding is that the State's decision about the source of the money is based  And so I would appreciate whatever rates you want with the home care providers, regardless of what Medicaid says about those services. You, the State of Illinois, you mean? Yes. State of Illinois, Your Honor, as far as I know, I'm not aware of any limitation. I expect that there may be some at some point, but in terms of the – Mr. Smith, I think that there's a – I must say that I might have labored under it. From your adversary's statement, it appears as if there's a belief that the Federal Government sets a fixed amount, and that's what the State has to pay. Whether the Federal Government pays you a certain amount, however, you seem to be saying the State can go above that amount if it chooses. That's the cooperative nature of this. Your Honor, the exact nature of the fund transfer from the Federal Government to the State may well be based on an individual's annual cost for the particular diagnosis. I'm in the realm of speculation here, but it's very clear from this record that these decisions about how these individuals will be paid are made by the State, and that they have the discretion under the program to do that, and that they decided that they would deal with the problems of recruitment and retention and morale in this workforce, which is, of course, scattered to tens of thousands of work sites. Mr. Smith, what I don't understand is why the union's participation in this is essential. The State can say this is how much these people are being paid. It's not enough. We want to increase it. We want to increase it by 10 percent, 20 percent, 30 percent, whatever it is. They need some they should have extra benefits. Well, we'll give them these benefits and these benefits and these benefits. Why do they need to have the union intervene here? The State of Illinois, like many employers, decided that, A, they would get that right more likely if they were dealing with a representative of the workers who told them what they care about, whether it's paid vacation versus higher wages versus less hours during the week or more hours during the week or whatever it might be. It also said that because this — these decisions are going to be made in a process of negotiation in which the workers know they have a place at the table, somebody who is there looking out for their interests, the workers will have a different sense of commitment to you. Well, that's fine for the workers who want the union to represent them. It's fine for the workers who want the union to represent them.  It's fine for the workers who want the union to represent them in making these demands on the State. Let me give you this example, which I think gets to what the plaintiffs in this case find disturbing. And let's say this is a — this involves a teacher's union. So the teacher's union is negotiating about the issue of tenure and merit pay. And the union is opposed to any change in the tenure system. It's opposed to merit pay. Now, there is a teacher who is not a member of the union, who disagrees completely with the union on these issues. But this teacher, and the teacher is not a member of the union, but still has to pay a pretty hefty agency fee, maybe $700 a year. So the teacher is paying this money to the union to make an argument to the employer with which the teacher completely disagrees. Now, if this teacher just wants to get back to a neutral position, the teacher is going to have to spend $700 or maybe $500 of his or her own money, pay that to another organization that will present that teacher's point of view to the employer. How can that be — what would you say to that teacher, that, you know, you have a right to be — you have a right to say whatever you want on these issues, but you don't have a right to be a teacher? Well, Your Honor, I would say that the Court has correctly held over a period of more than 30 years that that requirement is an appropriate thing which a public employer is allowed to impose because of the duty of fair representation and because of the benefits of allowing collective bargaining to proceed with the duty of fair representation imposed on the union. As Justice Scalia put it in his Leonard opinion, this is not a normal sort of free rider argument. This is a free rider argument where the law requires the union to look after that teacher and make sure that they get treated equally. Are you saying that this — that unions reluctantly accept the duty of being the exclusive representative for all the employees? They don't really want to do this, but the law requires them to do this. But because the law requires them to do this, then they have to get this agency fee. Is that really — is that realistically what happens? Well, that is the system we have, Your Honor. And imagine what the world would look like if there weren't a duty of fair representation. Alitoso, the unions do not want to have the responsibility — they don't want to be in the status of the exclusive bargaining agent for the employees? I think there may be a variation on that. I imagine there might be some union out there that would love to be able to favor their members over others. But the law doesn't require that, and for a very good reason, including a First Amendment reason. Imagine a world in which that teacher is — would be paid 10 percent less, as we were discussing before, because that teacher has chosen not to be a full member of the union. And imagine the pressure on associational rights that would be created for that teacher faced with that choice. You could be paid 10 percent less doing the same work, or you could be paid the same as everybody else, but you have to fully join the union and pay for their political speech, pay for everything on the non-chargeable side of the line. And, you know, what this Court has done over the last 30 years is use that distinction between chargeable and non-chargeable items to balance the First Amendment interests of the dissidents. Kennedy, I'm sorry, but in talking about First Amendment interests, let me ask you this. Is it not a standard issue in collective bargaining for the employees' union to talk about the size of the workforce? Your Honor, I don't think so. It's necessarily so if you're talking about hours. It is certainly possible that in some situations the union is talking about that. All right. And would you think that this is a legitimate subject of collective bargaining for which the non-union member has to pay? It is certainly not a subject of collective bargaining that could arise in this situation. This situation Let's say the teachers' union. They're talking about classroom size. They're talking about hours. That necessarily involves the size of the workforce, does it not? It is possible, Your Honor. It's entirely up to the public. It's not only possible, it's necessarily true. Let's assume that it's true. Assuming the school district decides to let that happen. Let's assume that it's true. Right. That a union's position necessarily affects the size of government. Is not the size of government a question on which there are fundamental political beliefs, fundamental convictions that are being sacrificed if a non-union member objects to this line of policy? Are there not other union proposals that say that State employee's salary must be a certain percentage of the total State expenditure? Does this not also involve the size of government, which is a fundamental issue of political belief? Any outcome of a negotiation of a collective bargaining agreement involving public employees will involve the expenditure of public money in a variety of ways. And the outcome of that will, in that limited sense at least, be a matter of public concern. Every bit as much and no more than when a government contractor comes in to negotiate a union. I'm not talking about a question of public concern. I'm talking about whether or not a union can take money from an employee who objects to the union's position on fundamental political grounds. Well, Your Honor, that is what the Abood distinction between chargeable and nonchargeable means. I'm asking the justification for that under the First Amendment. Right. In an era where government is getting bigger and bigger and this is becoming more and more of an important issue to more people. But I think it's important to understand that while there is a impingement on the First Amendment interest of any employer employee required to pay the fair share fee, this isn't any government employee context in which the government has the ability, when it serves its important interest as an employer, to demand that its employees pay the fair share fee. But that's the issue in the case if you're looking at the legitimacy of Abood. Well, Your Honor, look at what's been said. You say it's fair share. The objectors to Abood say that it isn't. Look at what the union is, what the money is being spent on in this case. It's being spent on negotiating the contract, which has produced a package of benefits and wage increases that have been extremely important to everybody in this workforce. It's being spent on a call center that allows people to call to their union and get answers to questions about problems, a grievance system that makes sure their fee checks don't go missing and helps them address that problem, training, gloves that they need for their personal safety in the workplace, and health care benefits. Now, there are maybe people who think it's politically controversial to have to contribute to a union that does those things and nothing else. But I submit to you that balance that against the interests of the State as employer in saying we want to have this partnership with this union, this will help us do a better job delivering services to this vulnerable population and save us a lot of money in the amount of institutions. Roberts. Mr. Smith, the first word in your brief is Medicaid. I don't understand, because the argument can be made that Medicaid reimbursement rates is an important public policy issue, not simply a labor issue. Now, let's say you have a teacher's union, okay? They think it's a very important public issue. They have a platform, they engage in activities to get higher Medicaid reimbursement rates. Is that something that a nonunion member would have to pay for? Or would that expense be segregated out of what they must pay? I'm sorry, Your Honor, could I just hear the question one more time? Teacher union, okay? Yes, sir. They have a political position on Medicaid rates. They spend money to advance that position. If you're a teacher but you're not a member of the union, do you have to pay for that expenditure? It would seem to me, Your Honor, something that's not within the chargeable expenses that a teacher's union could charge. Right. Same public, same expenses for Medicaid. Yes. But you're a home care provider. Your union spends to get higher Medicaid rates. You're not a member of the union. Do you have to pay for their political activity to raise Medicaid rates? To the extent that you're talking about the negotiation over how much you're going to be paid for providing services, I think it's perfectly appropriate under the Court's cases. No, you think one of the same speech with respect to one union is a speech on a matter of public concern, but with respect to another union, it's not. It's on the chargeable side of the line when it has to do with the terms and conditions of employment of the members of the union or the nonmembers of the union. Okay. So it's Medicaid. Now, is that part of the chargeable expenses or not? This union wants to talk about Medicaid reimbursement rates. Can a nonunion member be compelled to share that expense? If what you mean by Medicaid reimbursement rates, Mr. Chief Justice, is the hourly rate that's going to be paid to the union. I mean Medicaid reimbursement rates. That's what I mean by Medicaid reimbursement rates. Well, if that's what you mean, then it seems to me very clear that they should be allowed to charge the dissident nonmember because that person is going to get all the benefits of it. So in this case, if this union negotiates over Medicaid reimbursement rates, it is chargeable? Yes, Your Honor, to the extent that you're talking about the terms and conditions  chargeable. And that includes Medicaid reimbursement rates. In the limited sense that there are hourly wages going to these individuals, yes, Your Honor. The question you're being asked, I think, is a broader question. Collective bargaining with any employer, meatpackers, ours, safety depends on ours, always can involve public interest questions. Yes, Your Honor. But I think the question you're being asked is, where you have SEIU or AFSCME and they're government unions, does it have a bigger mix of public policy issues and, therefore, should this Court get into the business of saying when the union is too much of a labor lay wages, hourly wages, and so on, should this Court get into the business of saying, well, the labor and working conditions are too likely to affect public issues and the other one is less likely, et cetera. You see the distinction that the question that was added suggests. Now, I would like you to think about that's a philosophical question or a very broad First Amendment question. And I'd like to hear what your answer is and the government's. My answer, Your Honor, would be that the fact that it is a public employee union representing public employees means that in one sense everything that is being negotiated could be viewed as a greater matter of public concern. On the other hand, that is not a reason, as Abood held, to up the ante in terms of constitutional scrutiny. To the contrary, this is the government as employer dealing with its employees about the basic terms and conditions of their employment. Alito, let me ask you a question about pensions. Now, that's a very big public policy issue. I think in Illinois, the legislature recently cut the pensions of public employees. That would be a subject of collective bargaining, right? So that would be – bargaining on that would be chargeable? It would be a subject if the State chose to let it become a subject. The State completely controls what can be a subject of collective bargaining. Well, if the union spends a lot of money trying to bargain on that issue, that's a chargeable expense, is it not? If the State has chosen to make it part of the contract, it can be negotiated, yes. All right. Now, what do you say to the young employee who is not very much concerned at this point about pensions, but realizes there's a certain pot of money and it's either going to go for pensions or it's going to go for salary at the present time? So that employee, who's not a member of the union, has to pay for the union to bargain with the State to achieve something that's contrary to that person's interest. But you say that person is a free rider. Yes, Your Honor. That person, if it's not paying their share of that, then you have two things that happen. The other members, the other people in the workforce have to pay more to support the process, or the union doesn't have the resources needed to be an adequate partner with the State in producing the outcome that the State has chosen to try to  And so there are very beneficial arrangements are made that satisfy the priorities of everybody here, the workers and the State, and indeed the clients that they serve. Suppose the young person thinks that the State is squandering his heritage on unnecessary and excessive payments for benefits and wages. Is that not a political belief of the highest order? And, you know, we talk about free riders, which is an epithetical phrase. Maybe the objecting employee would say that the union is a speech distorter. It is taking views that are not his and making them mandatory subject of bargain and charging him for it. What's missing, I think, in this conversation, Your Honor, is that all of these burdens on people's associational rights or free speech rights or whatever you want to call them arises only because somebody has chosen to come take this job working for the State on the terms the State offers. And as you've said many times Kennedy, so your position is that public employees must surrender a substantial amount of First Amendment rights to work for the government? When there are substantial interests of the government as employer that are served by the sacrifice, which you've said over and over again in Duryea, in Garcetti, in a whole line of cases, is the government gets to have leeway as an employer when there are real interests at stake, and that in that situation the employee can be put to the choice. Thank you, Your Honor. Thank you, counsel. General. Mr. Chief Justice, and may it please the Court. The line drawn in Abood is sound. It has the force of stare decisis behind it. It is completely consistent with this Court's First Amendment jurisprudence and it requires affirmance. If I could, I'd like to turn to the questions that Justice Kennedy has raised, because I do think it gets to the key issue in the case. I think the key point, the key takeaway in this case is that the context we are dealing with here is the government as proprietor and manager of its own operations. And this Court's case law has said over and over again that in that context, two things follow. First, the government's interest in the effective and efficient carrying out of its own operations is entitled to very substantial weight, more substantial weight than would get if you were looking at the government as sovereign, regulated and citizenry. And second, yes, Justice Kennedy, indeed, as Your Honor's opinion in Garcetti and Your Honor's opinion in Bureau of Duryea recognized both times, the employee's First Amendment interests are diminished to the extent that the government has more latitude when the government can show that the obligation it is imposing is in furtherance of the government's legitimate interest as manager of its own operations.   weight than would get if you were looking at the government as sovereign, regulated and citizenry. Robertson, does Medicaid have anything to do with this case? Verrilli, let me do my best to try to clear that up, Mr. Chief Justice. I'm going to give you the best answer I can to your question. Remember, Medicaid, of course, is a joint Federal-State program. The Federal government provides funds, the State provides funds. Here we are operating within a waiver program in which the State is given considerable latitude to set wages and set rates so long as it is saving money as compared to the institutionalization of this population. My understanding is that HHS will review wage rates set to make sure that they meet the very general parameters, they were of the kind that were described in the Douglass case that was before the Court a couple of years ago, that are they high enough to make sure the service is providing, provided effectively, and are they, and are they constrained enough that you're not wasting money. Roberts, your statement of interest explaining why you're here today discusses the effect of the Medicaid program. Right. But it's not that the Federal government isn't approving the specific hourly wage rate as Medicaid reimbursement within this program. That's a judgment that the Medicaid program leaves to the considerable discretion of the State. If the union wants to talk about Medicaid rates with the State because they would get a higher wage or could get a higher wage if Medicaid reimbursement was higher, is that within the, they're functioning as a union rather than a political group? Not as I understand it. I think applying the line of Leonard, that that would be on the impermissible side of the line. That would be effectively seeking to change public policy by changing what the legislature or the administration is. Roberts, so if the union wants to say, look, the only way our people are going to get higher wages is if there's a higher Medicaid reimbursement rate for this service, that is not within the scope of collective bargaining? I think, my understanding is that that would be, the question there was which side of the line that the Court drew in Leonard is that on. I think that's probably on the impermissible side of the line, but that's where the fight would be. It would be over where that line should be drawn, not over whether the State, as manager of its own operations, can use collective bargaining with a fair share, as Justice Scalia mentioned earlier, in a way that private employers routinely do. I mean, I do think that's the fundamental point of Abood, that private, that the government as employer, as manager of its own operations, ought to be able to make the same kind of choice that private employers make when they think it advances their interests in efficiency and sound operation. Sotomayor, in this case, were worked in a unionized, excuse me, in a unionized Federal workplace, would they be assessed a mandatory agency fee? No, they would not, Justice Alito, and we're not here making an argument that as a matter of policy, States ought to adopt fair share or not. The thing that matters to us is the principle of First Amendment law. So the Federal government doesn't think that it needs to assess a mandatory agency fee from, let's say, the employees in the Border Patrol in order to make sure that the Border Patrol has high morale, sufficient salary, sufficient benefits. It can do without the agency fee in that situation. Roberts. Verrilli, but the key point for us, the point of vital importance for the United States here, is that the Court continued to recognize the context, the First Amendment context, of government as manager of its own operations. And whatever choice the United States has made, many States have made different choices in their role as manager of their own operations. And under the Court's established case law, which Abood, I think, is a quite good example of, the principle, that when the government is acting to further its operations as manager, they get substantial latitude. Now, there's a limit on that, of course. They can't use that authority to – they can't leverage that authority to affect the way citizens interact as citizens in the most specific areas. Scalia, one can be skeptical about whether when States do this, they're doing it because it's more efficient as an employer, because some States have tried to force private employers to have a closed shop, haven't they? Verrilli, I think State – Scalia, and there's no, you know, no State government interest in it. There's just State interest in unions. Verrilli, yes, but here we are – Scalia, and unions getting a lot of money from people who don't belong to the unions. So one can be skeptical about whether this is really what's going on, that the State really thinks it's going to be a lot easier if it has a closed shop. Verrilli, I guess what I would say about that, Justice Scalia, is that one could speculate about motives of States like Illinois. One could speculate about the motives of the right-to-work States. But I would suggest that under our Federal system that States get to make those kinds of policy choices. And Illinois has made a policy choice, as many private employers have, that using collective bargaining – and it is, I want to stress here, very narrowly tailored collective bargaining. By law, it can only be over wages, hours, and conditions of employment. By law. Alito, do you think that the specific factual background of what occurred here provides a basis for skepticism about Illinois' reason for adopting this? Verrilli, I don't think so. When it was – the legislation was enacted, it was enacted with a very large bipartisan margin, and I just don't think it would be appropriate in the context of government as manager of its own operations to look behind and try to consider motive. This is a choice that many people have made. Alito, I thought the situation was that Governor Blagojevich got a huge campaign contribution from the union, and virtually as soon as he got into office, he took out his pen and signed an executive order that had the effect of putting, what was it, $3.6 million into the union coffers. Verrilli, whatever happened to it? That's the sequence? Is that correct? Well, I think the issue before the Court is the constitutionality of the statute that was enacted subsequent to that by a large bipartisan majority, and I don't think it would be appropriate to look behind the legislature's action to consider and try to evaluate its motives. And I think under our Federal system, States get to make choices. It's true, not every State does it this way, but many do. They do so for reasons of efficient management of their internal operations, and that's the principle that we think is of critical importance. Scalia, they may do so because of that reason. You don't know what their reason is any more than I do. And all you can say is that that might be their reason. And they ought to have the discretion to make that choice under this Court's case law. That's our position with respect to that. If I could make a point that I think is an important point about the free rider rationale under Abood, there has been some suggestion that the point of the free rider rationale is to force the dissenters, the nonunion members, to pay up. I don't think that's the right way to understand the free rider point, that once the State has imposed the duty of fair representation, then everybody's got an incentive to free ride, whether you're a union supporter or not, because by operation of law you're going to get the benefit. It's just a classic logic of collection action, collective action problem. And so the fair share requirement really is content neutral, and that is it's designed to ensure that the union has the funds it needs to carry out the responsibilities that the State wants it to carry out, and that that could be jeopardized by supporters as well as dissidents deciding that they don't want to pay because they don't have to, because the law would get them the benefit of the duty of fair representation even if they didn't. Now, with respect to the question of whether Abood should be overruled, I would suggest to the Court that it's got a very powerful stare decisis effect behind it. Abood is not exactly an outlier. It was reaffirmed in Leonard. In Ellis it was reaffirmed just in 2009 unanimously in the Locke case. As Justice Breyer indicated, there is very substantial reliance and contractual reliance throughout the country on the constitutionality of Abood. And as I said, I think the most important point here is that the line the Court drew in Abood and the line that has stood for 40 years is entirely consistent with the Court's First Amendment jurisprudence in the context of government as employer, not as regulator of sovereigns. Of course, if the government was acting as sovereign regulating the citizenry, an obligation of this kind would trigger the most exacting scrutiny. Alitoso, is it true that from the beginning there have been members of this Court who have questioned whether there is any principled basis for distinguishing between the chargeable and the nonchargeable expenses, and also have questioned whether, as a practical matter, that can be done? Justice Marshall made that argument, didn't he not? Verrilli, Yes, certainly that question has been raised, but it was those questions were actually all raised before it was reaffirmed in Leonard, before it was reaffirmed in Ellis, and before it was reaffirmed unanimously in Locke. Thank you. Roberts, Thank you, General. Mr. Messenger, you have 4 minutes remaining. Messenger, I suspect you're going to answer my question, so I want to focus it, and I'm sorry to do this, but I think it's important. I suspect you cannot answer my question about reliance without accepting one of the following three propositions. First, unlike every other employee, government employees have no right to organize. Or, second, they have a right to organize, but they cannot bargain about wages, working conditions, and hours. Unlike any other, that's the same as the first. Or, third, the courts of the United States are going to fashion, using the First Amendment as their weapon, a new special labor law for government employees, and I'd remind you we have some experience on that in the 1930s, where courts tried to do something analogous. Now, answer my question about reliance. I believe the reliance interests here are insignificant if a boot is overruled, because the result will simply be that employees cannot be forced to support union representation. Sotomayor, Why would anybody join a union under those circumstances or pay enough to support the union efforts? Messenger, because the union first would control the terms of their economic conditions of employment and have control over their relations to their employer, which creates a strong incentive for an employee to want to be on good terms with that union. And also, usually the union gains employer assistance with becoming an exclusive or with retaining membership, such as access to facilities. Scalia, but it's only people who disagree with what the union is doing who can refuse to pay, you say. Right? Messenger, Yes. I mean, anyone who voluntarily agrees. Scalia, Why can't people who agree with the union just say, hey, I don't have to pay. The union is going to do this stuff anyway. I'm going to ride for free. These other people are riding for free. Messenger, People could have different motives, but I submit that the union has to pay. Scalia, Is there any way to decide who's doing it just to save money and who's doing it on principle? Messenger, Not that I'm aware of. Scalia, So you're essentially destroying not just the closed shop, but you're destroying the ability of the union to get money even from the people who don't agree with what it's doing. Messenger, Well, two points. First, exclusive representation, I submit, is not an impediment to gaining membership. It helps a union gain voluntary support for it. It's much easier for a union to ask people to support it if it has power over their terms of employment. So the free rider problem with an exclusive representative is actually less than it would be if the union was a voluntary organization, not as it doesn't make it worse. I mean, there's a reason that unions seek exclusive representation in the Federal Government, in the Postal Service, and in the nation's 24 right-to-work states. Because it's an incredible thing. Kagan, Do you doubt that these are you said that there were no reliance interests? And that's curious to me. There must be thousands and thousands of contracts across the United States with fair share provisions. Do you doubt that these were core central provisions in the making of these contracts, that if these kinds of provisions were prohibited, the agreements would look fundamentally different in many ways? Messenger, The main difference is just the compulsory unionism clause and the agreement would be gone. But otherwise, the agreements would be the same. Kagan, Do you think that the union would not ask for anything, would not have different you know, would not ask for different mechanisms in order to support its own activity? The unions go into these contracts with the understanding that this is what's going to enable them to at once satisfy their universal obligation to employees to fairly represent them and also get the funds they need for administrative and other expenses. Messenger, I would submit that with compelled fees off the table, the union would actually have more leverage to get things for employees, because the compelled fees clause is leverage for the employer, because that's something the employer or the union wants, and that the employer doesn't care if it gives away, because ultimately, that's money out of somebody else's pocket. Kagan, So you think that if we just strike these provisions, in other words, the contracts would have been negotiated in exactly the same way, nothing else would have changed? If I may finish? Please, Chief Justice. I believe that they probably would be very much the same, but to the extent they'd be different, they'd be more in the favor of employees, because the employer wouldn't have that leverage over the union with respect to its demand for compulsory fees. Thank you, counsel. The case is submitted.